LAMMOT's Heirs & Devisees *vs* BOWLY's Heirs.

APPEAL from a decree of *Baltimore* county court, sit-ting as a court of equity, *dismissing* the bill of the com-plainants, (now appellants.) The bill stated that *William Lux*, deceased, being possessed in his own right, in fee simple, among other property, of a tract of land called *Chatsworth*, by his will, dated the 5th of May 1773, did, among other things, devise as follow: "I give and bequeath to my dear wife, *Agnes Lux*, for and during her natural life, my tract of land and plantation, called *Chatsworth*, with the dwelling house, and all the buildings and improve-ments thereon, (save and except the rope-walk.") "I give and bequeath to my dear son, *George Lux*, his heirs and assigns, my tract of land called *Chatsworth*, lying and be-ing in *Baltimore* county, containing nine hundred and fifty acres; but in case my said son should die before he attains of legal age, and without issue, then I leave and bequeath the said tract of land, called *Chatsworth*, to my dear wife, *Agnes Lux*, or her assigns, to be at her own will and dis-posal, as it originally was, (save and except five acres, to be laid off in a long square, on the south two degrees west one hundred and thirty-one perches line, being the fifth line from the beginning; and that said five acres, together with the rope-walk, and all the buildings and improve-ments thereon, I give and bequeath to my dear nephew and partner, *Daniel Bowly*, his heirs and assigns.") "And all the rest and residue of the said tract called *Chatsworth*, I give and bequeath to my said nephew, *Daniel Bowly*, and his heirs and assigns." "*Item*, I leave and bequeath my dear son, *George Lux*, residuary legatee of my last will and testament." "*Lastly*, I hereby nominate, consti-tute and appoint, my nephew, *Daniel Bowly*, executor of this my last will and testament, desiring him to see the same faithfully executed." That *George Lux*, after the death of his father, entered into and was possessed of the said tract of land, and being in quiet and undisputed and undivided possession, and also having attained the age of twenty-one, did, by deed dated the 17th of April 1787,

A party contract-ing under a clear and unequivocal mistake of his le-gal rights, where such rights are of a doubtful charac-ter, will be reliev-ed in equity

*L*, by his will, de-vised to *A L*, his wife, "for and du-ring her natural life, my tract of land called *Chats-worth*, with the dwelling house, and all the build-ings and improve ments thereon, (save & except the rope-walk.) And I give to my son *G L*, his heirs, &c. my tract of land called *Chatsworth*, &c. but in case my said son should die before he attains of legal age, and with-out issue, then I bequeath the said land to my said wife, and her as-signs to be at her own will and dis-posal, as it origi-nally was, (save and except five acres to be laid off in a long square, &c and that said five acres, together with the rope-walk and all the build-ings, &c. I give to my nephew and partner, *D B*, his heirs,") &c. *D B*, the nephew, be-lieved that he had no title to the five acres, unless *G L.* the testator's son, died *within age and without issue*, and on his having issue, supposed the son to have a clear title to the five acres. Under that impression, he was privy to a sale of that part of *Chats-worth* by *G L*, to *D L*, for a fair and valuable conside-ration, and permit-ted *D L* to take possession of it, and to enjoy it for many years unmo-lested. After-wards, being advised that the effect of the devise was to give him these five acres, independent of the contingency of *G L*'s coming of age, or dying without issue, he instituted an ejectment for them, and recovered. On a bill in equity filed by *D L* the purchaser, to stay proceedings on the judgment at law—Held, that the relief could not be granted, that *D B* was not to be affected by his knowledge of the sale of the property, and his long acquiescence under it, as in so doing he acted under a clear *mistake of his own title.*

1825.

Lammot
vs
Bowly

convey, among other property, the residue of the said tract of land, called *Chatsworth*, so devised to him, (and which had not been previously conveyed by him,) to *William Russell*, in fee simple, in trust for the several uses, intents and purposes, therein declared, and among others, to sell and dispose of such parts of the same as the said *Russell* might think proper, to enable him to pay the debts due by the said *George*, &c. That *William Russell*, and *William Lux*, in the life-time of *William Lux*, with whose sister *Russell* had intermarried, were indebted to *Harry Dorsey Gough*, on a bond, dated the 12th of December 1760, for £100 sterling; that *William Lux* and *Daniel Bowly*, (the said *Bowly* being a nephew of *William Lux*,) were indebted also to *Gough* on a bond, dated the 11th of August 1768, for £500; that the principal sums of these debts, as likewise a large amount of interest, remained due until the 20th of July 1787. That *William Russell*, in pursuance of the deed of trust to him from *George Lux*, and to discharge in part the said debts due by *William Lux*, in his life-time, jointly as aforesaid, and which the said *George* was bound to pay, as heir and devisee of *William Lux*, did sell the lands hereinafter described, being part of the said tract called *Chatsworth*, to *Daniel Lammot*, (the ancestor of the complainants,) who had applied to *Gough* to allow him a credit on the debts due to *Gough* from *Russell, Lux* and *Bowly*; but it was agreed between the parties, that the said land should be conveyed to *Gough*, in order to make the same responsible to him for the credit so given. That in conformity with the said agreement and understanding, *Russell* did, by a deed duly executed, acknowledged and recorded, according to law, bearing date the 27th of April 1789, convey, in fee simple, to *Gough*, the said land, being part of said tract called *Chatsworth*, and part of the property conveyed to *Russell* by *Lux*, and which is contained within the following description, that is to say, &c. containing and sold for 16 acres and a quarter of an acre, together with all rights, privileges and advantages, unto the same belonging; that *Gough* never had actual possession of the said land; he took the said *Lammot's* penal bond for the credit granted as aforesaid, and passed to *Lammot* his bond, to convey the said land when the debts of *Lux, Bowly* and *Russell*, should be discharged, which were guaranteed by the said

land. The bill charges, that *Daniel Bowly* was privy to, and perfectly acquainted with, and fully assented to the transactions aforesaid, being in reality a party thereto—— that the said land above described was in fact sold to *Lam-mot* by *Russell*, in two parcels, both of which were included in one conveyance to *Gough*, as aforesaid, and *Gough* made a settlement or an adjustment of his claim on *Lux* and *Bowly*, with *Bowly*, whereby on the 20th of July 1787, he credited them with the sum of £523 15, *Maryland* currency, for land (being part of the land herein before particularly described,) sold by *William Russell*; and on the 2d of April 1789, *Gough* credited the account of *Lux* and *Bowly*, with £70, *Maryland* currency, for two acres more, (being the residue of the said described land,) and that *Gough* did charge *Lammot* with the said two sums of money which he had before credited *Lux* and *Bowly* with, as aforesaid, so that the said purchase money, which *Lammot* agreed to pay to *Gough*, for the said land, and which he did subsequently pay in full with interest, was applied to extinguish the like amount of what was due by *Lux* and *Bowly*, and the latter was thereby released and discharged from the further payment of that amount. Of all which facts and circumstances *Bowly* had the most intimate and exact knowledge, deriving by the transactions aforesaid, very valuable and important advantages. That *Daniel Lammot*, at the time, or shortly after, his purchase from *Russell* of the said described land, (the conveyance of which was made to *Gough*, as aforesaid,) did enter into actual possession of the said land, and so continued in quiet and undisturbed, and undisputed possession for many years, that is to say, until or about the year 1804, (except so far as *Lammot* had disposed of certain parts thereof to *bona fide* purchasers and lessees,) when *Bowly* pretended that he was entitled to the said land, or to some parts thereof; and on the 29th of September 1804, *Daniel Bowly* brought an action of ejectment in the general court, which is now depending in *Baltimore* county court, against the said *Daniel Lammot*, alleging that the said *Bowly* was entitled to the said land, or to some part thereof, under and by virtue of the will of *William Lux* herein before referred to. That the whole of the purchase money agreed to be paid by *Lammot* for the said land, having been paid by him to *Gough*, the said *Gough*, did by his deed, exe-

cuted, acknowleged, and recorded according to law, and dated the 9th of May 1801, convey the above described land, being part of *Chatsworth*, to *Lammot* in fee simple; that *Daniel Bowly* always lived within or near the city of *Baltimore*, adjoining to it, and within what is called the western precincts thereof the said land is situated, and that *Bowly* had early and full knowledge of the contents of the said will of *William Lux*, his uncle, (his own name being particularly mentioned in said will,) that he had as before set forth, full, perfect, and exact knowledge of the contents of the said deeds herein referred to, and with all the circumstances, motives, and considerations which accompanied and influenced the execution of them, having participated therein as aforesaid; and further that *Bowly*, by writing under his own hand, did furnish instructions in part to the surveyor, appointed to lay out the lands purchased as aforesaid from *Russell*. Yet that *Bowly* having thus knowledge of, and acquiescing in the long and continued possession and occupation of said land, by *Lammot*, never suggested or pretended that he had any title or interest, either at law or in equity, in or to the said land or property, or in or to any part thereof, until in or about the year 1804, and shortly before the institution of the said action of ejectment, and long after *Lammot* had paid the whole purchase money for the said land to *Gough*, and *Gough* had executed the said deed. The bill then states the death of *Lammot*, and that the complainants are his heirs and devisees. It also states the death of *Bowly*, and that the defendants (now appellees) are his heirs, &c. who have become parties to, and are now prosecuting the said action of ejectment against the said complainants, who have become parties to, and are now defending the said action; that the said heirs of *Bowly*, and the complainants, have severally succeeded, and become entitled to all the rights, claims and interest, of their respective fathers, in regard to the land herein before described, and held in possession by *Lammot* in his life-time. Wherefore the complainants represent, that they are justly and equitably entitled to hold and enjoy the lands and premises herein before particularly described and conveyed as aforesaid, (except so much thereof as *Lammot*, in his life-time, sold or leased,) free, clear and discharged, of and from all claims, title, demand or interest, in or to the said

land, or in or to any part thereof, of the heirs of *Bowly*, or of any person or persons claiming under him, them, or either of them. And that if the said heirs have any title at law, in or to the said land, or to any part thereof, (which the complainants do not admit,) yet they are not, in good conscience or equity entitled to claim, recover, or hold the said land, or any part thereof, but on the contrary, they are altogether destitute of all just rights or equitable interests therein or thereto, and to every part thereof.

- *Prayer*, that the defendants may be decreed to release all right, title and claim, or supposed title, in and to the said land purchased and possessed by *Lammot* as aforesaid, which may at law now exist or remain in the said heirs of the said *Bowly*, unto the complainants; and that the complainants may be righted and relieved in all and singular the premises, according to equity and good conscience, and that the defendants may stand to, observe, and perform such order and decree therein as the nature of the case requires, and shall seem meet, &c. The answer of the defendants admits that *William Lux* was in his life-time seized and possessed of the said tract of land, called *Chatsworth*, as stated in the bill of complaint; and they are informed and believe that he had been so seized and possessed of the same for many years before, and till his death, and at that time; and that for several years before his death, a rope-walk had been established by him and *Daniel Bowly* thereon, in partnership, which was carried on by him and *Bowly*, as partners, from the time of its erection until the death of *William Lux*. They admit that *William Lux*, being so seized of the said tract of land, did on the 5th of May 1773, duly make and execute his last will and testament, appointing thereby, *Daniel Bowly*, the executor thereof; by which said will, *William Lux* did, as they are informed and believe, devise to *Daniel Bowly*, in fee simple, five acres of land, part of the said tract called *Chatsworth*, including the said rope-walk, to be laid of as by said will directed; and so it has been, by the high court of appeals solemnly decided, in an ejectment instituted by the lessee of the said *Bowly* against *Lammot*, the father of the said complainants, and therefore they deny, that *William Lux* devised to *George Lux*, any part of the said five acres of land, but only so much of the said tract of land

1825.

Lanmot
vs
Bowly

called *Chatsworth*, as remained free and clear of the same. That they are informed and believe the said *William Lux* departed this life on or about the 20th of February 1777, leaving his wife *Agnes*, at that time in full life, and that she afterwards departed this life on, &c. and that immediately after the death of *William Lux*, the said *Daniel Bowly*, having entered upon the said rope-walk, and the land adjoining, so devised to him, the said rope-walk was carried on for a considerable length of time by the said *Bowly* and *George Lux*, whom the said *Daniel* took into partnership with him in that business, and during that time, the said rope-walk was carried on by *Daniel Bowly* and *George Lux*, in the same manner as it had been before by *William Lux* and *Daniel Bowly*. They admit that *George Lux* having arrived at full age, did on the 17th day of April, in the year of our Lord, 1787, duly make and execute to *William Russell*, a deed duly acknowledged and recorded, which they presume to be the same mentioned by the complainants in their said bill. But they say that the said deed purports only to convey such part of *Chatsworth*, of which he was seized in fee, and which he had not granted or conveyed away, and did not, nor could it, operate to convey to *William Russell*, any part of the said five acres of ground, so devised to *Daniel Bowly*, or any interest therein; nor have they any reason to believe that *George Lux* intended it should. That they are informed and believe, when *William Lux* died, *Harry Dorsey Gough* was possessed of a bond given to him by *William Russell* and *William Lux*, for the payment of £100 sterling, and dated on the said 12th day of December, 1769, which sum they are informed and believe to have been the proper debt of *William Russell*, and that *William Lux* was only his security. And also, that *Harry Dorsey Gough* was at that time possessed of another bond given by *William Lux* and *Daniel Bowly* to him, for the payment of £500 sterling, dated the 11th day of August, 1768, which was for their joint debt, and that the said principal sums, with a considerable amount of interest thereon, were remaining due and unpaid on the 20th day of June, in the year 1787. But they further say, that they are informed and believe, that at the time of the death of *William Lux*, he was largely indebted to *Daniel Bowly*, and that the said estate of said *William Lux* was

indebted to *Daniel Bowly*, in a much larger sum than the said *Bowly's* proportion of the said joint bond so due to *Gough*, in consequence whereof it was the duty of *George Lux*, and *Daniel Bowly* had a right to compel *George Lux*, to pay and satisfy the whole of said joint debt to *Gough*, out of the estate of *William Lux*, which *George Lux* received, as heir or devisee of said *William*, and to indemnify him the said *Bowly*, against the said debt—And in consequence of the said deed of trust, *William Russell* was equally bound so to do. And at the same time, they allege that the estate of *William Lux*, which came to the hands of *George Lux*, as his heir or devisee, and which was so conveyed to *William Russell*, was much more than sufficient for that purpose. They here introduce and exhibit a plat of said tract, called *Chatsworth*, and certain parts thereof, and illustrations of said plat, which they consider necessary for the fully apprehending and better understanding certain facts, which they deem important to be stated and understood in the examination and decision of this suit; on which plat the said tract, called *Chatsworth*, is located; as beginning at the letter A, from whence the first five lines of said tract run, with the back lines, numbered with the black figures, 1, 2, 3, thence to the letter B, and thence to the figure 14, which line from the letter B, to the figures 14, is the 5th line of the said tract mentioned in said will, on which the said five acres are to be laid out in a long square, and the rope-walk aforesaid is represented on said plat by the narrow space between the two black lines extending from the small black letter *h*, to the letter K, through which runs the black broken line, which they are informed and believe represents the particular piece of ground, actually used and occupied as the rope-walk, and which, by the said devise, is directed to be included in the said five acres. They are informed and believe, that *George Lux*, before he executed said deed to *William Russell*, had entered into a contract with *Daniel Lammot*, whereby he had agreed, to sell to him a part of *Chatsworth*, containing 14 acres and one quarter of an acre, for the sum of £523 15s. current money, and contracted to convey the same by certain metes and bounds to him, upon payment of the said purchase money; which said 14 acres and one quarter of an acre are, as they are informed and believe, truly located on said plat, according to said metes and

1825

Lammot
vs
Bowly

bounds;—Beginning at the small black letter *h*, on said plat, and running with the red drawn lines, numbered with the red figures, 1, 2, 4, 6, 7, and thence to the beginning. That they understand and believe, that after the execution of said deed to *William Russell*, the said *Daniel Lammot*, not having yet paid the said purchase money, it was agreed between *George Lux* and *William Russell*, that the money so due should be applied by *Russell* for payment of debts to be satisfied under the said trust, and that when the money should be thus applied, *Russell* should execute a deed for the said ground, so sold to *Daniel Lammot*; and that in consequence of said agreement, and a further arrangement which took place between *Russell*, *Lammot* and *Gough*, he, *Gough*, on the 20th day of July, 1787, received the said debt, so due from *Lammot*, as a present payment, to the amount thereof, made to him by *Russell*, in part discharge of the said debt, which was due to him on the said bonds, and for which *George Lux* was answerable to him, as heir and devisee of *William Lux*; and on the said 20th day of July, in the said year, *Gough* credited *Daniel Bowly* and *George Lux*, on account of said debt, (the said *Bowly* and *George Lux* having previously given to *Gough* their bonds for the balance remaining due on said original bonds,) by the said sum of £523 15s. And on the same day *Gough* charged *Daniel Lammot*, as debtor to him, with the same sum of money; and to secure *Gough* from any risk by reason of this arrangement, *William Russell*, who had the legal title in him by virtue of the said deed of trust, on the same day executed to *Gough* a deed, conveying to him the said piece or parcel of ground thus sold by *George Lux* to *Daniel Lammot*, which appears to have been conveyed to *Daniel Lammot* by *Gough*, on the 9th day of May, 1801, and not before. That they are informed and believe, that *Russell* afterwards, to wit, on the 2d day of April 1789, agreed to sell to *Gough* two acres more of the said tract of land, called *Chatsworth*, for the sum of £70, to be applied by *Gough* in part discharge of the said balance still remaining due to him, and the same day *Gough* gave the credit accordingly. That they believe this purchase was made by *Gough* for *Daniel Lammot*, because it appears, that the same day *Gough* charged him as his debtor for that same sum, on account of said two acres of ground, and did af-

terwards convey it to *Lammot*, by the same deed by which he conveyed to him the said part before sold to him. And that *Gough*, having neglected to record in due time the aforesaid deed executed to him by *Russell*, the said *Russell* did, on the 27th day of April 1789, by his deed, duly executed, acknowledged and recorded, convey unto *Gough*, both the said parcels of ground, to wit, the said 14 acres, and one quarter of an acre, and the said two acres of ground; which said two acres are truly located, as they are informed and believe, according to the said metes and bounds, by which they are described in said deed on said plat, beginning at the red figure 3, opposite the north side of *Fayette street*, and running with red lines, numbered with red figures, 4, 5, 4, and thence to the figure 3, the beginning. That *Daniel Bowly* had not, any time before either of those sales, located or established any lines, metes or bounds of the said five acres of land, so devised by the said will, according to which they should be held by him; but that no part of said parcel of ground which *George Lux* so sold to *Daniel Lammot*, interferes with, or even is contiguous to the rope-walk, except a small portion thereof on the north, and not exceeding half an acre; but that in fixing the metes and bounds by which it was laid off and sold, there seems to have been peculiar attention that it should not interfere in general with any probable location which could, be made thereof, agreeably to said devise. They do not admit, nor do they believe that *Daniel Bowly* was privy to, or perfectly acquainted with, or in any manner assented to even the first of these sales, at least so far as the same interfered with the said rope-walk, or that he had any knowledge it did thus interfere therewith, or with the five acres thus devised; nor do they believe *Daniel Bowly* was privy to, or perfectly acquainted with, or in any manner assented to the sale of the said two acres, or had any knowledge that it in any manner interfered with said devise, until after the settlement that is stated to take place between him and *Gough*; but they are informed by those who were intimate with *Bowly* about that time, and they believe, that he was ignorant of the said two acres having been sold by *Russell* when made, or that it interfered with the said devise, and that when he discovered it, he uniformly expressed the utmost surprise and indignation at the conduct of *Russell* in so doing. And as to the

1825.

Lemmot
vs.
Bowly

allegation that *Daniel Bowly* was in fact and reality a party in those transactions, they believe it utterly destitute of foundation, for they say that they believe he considered himself no more than nominally concerned or interested in them; for though he was answerable to *Gough,* as far as he was a party to the said debt, yet as the estate of *William Lux* was indebted to him to a large amount, much more than his proportion of, or even the whole debt due to *Gough,* for the payment of which *George Lux* was answerable as heir and devisee of his said father, and as the property held by him under his said father, while held by himself, and afterwards thus conveyed in trust to *Russell,* was greatly more than sufficient to discharge all *William Lux's* debts, they apprehend that *Daniel Bowly* could not contemplate suffering any inconvenience to himself; and as he was engaged in other concerns of his own which engrossed all his care, time, and attention, he was less likely to trouble himself with those in which he could not suppose himself particularly interested; and the less so, as at that time, during those transactions, they believe he had no doubt of the honesty and uprightness of either *George Lux,* or *William Russell,* both of whom were his near relations and avowed friends, and whose disposition to discharge him from any responsibility on account of the said debts due to *Gough,* he could have no reason to question; and so far was that from being the case, that it was the original intention of *George Lux,* to have conveyed the said property to *Daniel Bowly* as his trustee, who declined it, because his other business and occupations would not give him sufficient leisure, and recommended it to him to make the deed to *Russell.* That *Daniel Bowly* did at length lose that confidence in *William Russell,* partly, probably on account of his having, under pretext of the said deed, thus acted to the prejudice of him, *Bowly,* and partly in consequence of his having, in many instances, wantonly sold the property which had thus been conveyed to him in trust, below its value, and applied the money to his own use, and therefore *Bowly* instituted, or caused proceedings to be instituted against *Russell* to vacate the said trust, to prevent further misconduct. Whereupon by a deed, in which *George Lux* joined with him, he, *Russell,* on the 7th day of May, 1796, conveyed to *Daniel Bowly,* all the said property contained in the former deed

of trust, which remained undisposed of by him upon the trusts mentioned in said deed thus executed to *Daniel Bowly*. After which, *Daniel Bowly* having thus become seized of that property, out of the proceeds of which the remaining balance of those debts, due as aforesaid to *Gough*, was to be paid, he gave his own bond for the same, to wit, on or about the 6th day of June, 1799; that all those credits which had been given by *Gough* on the said account, against *Daniel Bowly* and *George Lux*, had been given by direction of *Russell*, in consequence of transactions which had passed between *Russell* and *Gough*, in which it does not appear, nor do they admit or believe *Daniel Bowly* had any participation; that the said balance, as stated, was simply the sum that appeared to remain due after adding up the debits and credits; and therefore, supposing *Daniel Bowly* did sign the said balance, together with *Gough*, which they do not know or admit, and which they think immaterial, it amounted to nothing more than an admission on his part, that the difference between the debits and credits, as so stated and entered in said account, was equal to that sum, as it actually was. It is not suggested that the debits are erroneous, and it could not have been his duty to have objected to the credits, which had been entered under the direction of the parties to the transactions; but from this fact no inference can be drawn that *Daniel Bowly* knew that the pieces or parcels of land, for the price of which some of the credits had been given, were situate in such a manner as to interfere with said devise, even if he took notice that the said credits were on account of land sold, for he well knew that *George Lux* had conveyed in trust to *Russell* a much greater quantity of land, which did not interfere with said devise, than was necessary for the payment of all the debts for which he was answerable, instead of the trifling sum for which credits were given in that account, and he could not suspect that *Russell*, in selling those lands, had violated his duty by selling lands which he had no right to dispose of; and they deny, that it was on any settlement or adjustment between *Bowly* and *Gough*, that credit was given for the said sum of £523 15s. the price of the said 14 acres and a quarter of an acre of land, as suggested in said bill of complaint. They admit, that the money arising from the said sales was applied by *Russell* and *Gough*,

to the extinguishment of so much of the debt as was due from *Lux* and *Bowly*; but say it was for a debt, for which, though the said *Bowly* was nominally answerable to *Gough*, yet *George Lux* was under obligations to *Bowly*, to pay wholly to *Gough*, and was able to pay it; and they utterly deny that *Bowly* received great or important advantages thereby, because they say, that as there was abundant property belonging to *George Lux*, and conveyed in trust to *Russell*, to have paid the same amount, which was liable for the said debt, and which *Bowly* might have compelled to be applied thereto, it could not, therefore, be a valuable or important advantage to *Bowly*, that his own property should have been illegally and needlessly sold, and that greatly under its value, and applied for payment of a debt, which ought, in justice, equity and conscience, to have been wholly paid by *George Lux*, or by *Russell*, out of the proceeds of the property which had belonged to *George*, and which he had conveyed in trust to *Russell*, among other things, for the payment of that very debt. As to the allegation here again repeated by the complainants, that *Bowly* had the most intimate and exact knowledge of all the circumstances, they do not admit or believe it to be true, nor do these respondents know or believe that *Daniel Bowly* furnished instructions under his own hand, or in any other manner to the surveyor, or to any other person, directing the said land to be laid out in the manner it was sold, or interfering with the said devise, for the purpose of its being thus sold; but they think it probable enough, that after the said sale, he may have furnished instructions to the surveyor to lay out or run the land by the courses, according to which it had been sold, to discover its actual position, and whether it did interfere with the said devise. They admit that *Gough* never himself had actual possession of any part of said property so conveyed to him. And that the rope-walk aforesaid, at the time *William Lux* died, was situated in an old field, constituting part of the farm or plantation of *William Lux*, and which old field, except the small part occupied as a rope-walk, was cultivated or used for pasture, as part of his said farm; all which remained in the same situation for a long time after the death of *William Lux*, and they believe, till the time when the said sales were made as aforesaid, and had become an open common, and for some time

after; that the said old field contained within its extent; not only the said rope-walk and both the said pieces of ground so sold, but the piece of ground comprised within the four red lines located on said plat, beginning at the red figure 4, then running to the red figure 5, to the red figure 6, then to the red figure 7, thence to the beginning, (within which lines the letter T is inclosed;) as well as additional ground, all which lay in one common field, without being separated, the one part from the other, by any fencing or inclosure. That when *Daniel Lammot* made the said purchase from *George Lux*, or shortly after, they are informed and believe, he did enter upon some part of the said land contained within the metes and bounds mentioned, as including the said 14¼ acres, and made improvements thereon, by erecting a tan yard, where he carried on a tannery, but that these improvements were made by him a considerable distance from the five acres so devised, and upon the part which *Russell* had a right to convey, as laying clear of the devise to *Bowly*; and these respondents do not know or admit, that *Daniel Lammot* did by virtue of the said purchases, actually take possession of any part of the said land so devised to *Daniel Bowly*, until many years after the same had been thus sold as before stated; and although *John Eager Howard* and *George Lux*, contemplating the probable extension of *Baltimore-town*, and the advantage which in that case, it might be to their property, agreed upon a street to be called *Union-street*, to be established between them, yet at that time neither the said town nor precincts included the place, but the ground thus fixed upon for a street, constituted part of the old field, as far as the same was situate within the tract called *Chatsworth*, or was part of a common, as they believe and are informed, and was without improvements thereon; and though they admit *Daniel Bowly* lived the greatest part of his time in the city of *Baltimore*, or within a few miles thereof, yet he might certainly have lived thus near to those parts of the said tract, without knowing that *Daniel Lammot* had purchased land, the lines of which included, or that he claimed title to any part of the five acres devised to him, as long as the ground lay either in an old field or a common, without any part of the said five acres, or if any only a very small part of the same, being actually in the possession or occupation of *Daniel Lammot*, and the more probably so

1825.

Lammot
vs
Bowly

as his time and attention was so entirely engrossed with other concerns. They admit that *Daniel Bowly* was, from the death of said *William Lux*, well acquainted with the instrument of writing, executed by *William Lux*, as his last will and testament; yet they believe and are assured, that he was not well acquainted with his rights under that will until some time after, nor of the legal effect and operation of the said devise to him therein, but was induced erroneously to think that he was to take nothing by that devise, unless *George Lux* should die under the age of 21 years, and without issue, which was, as they understand, the mistaken construction generally given to that devise, and that which was given to it by the court of *Baltimore* county on the trial of said ejectment; it is not therefore to be wondered at, that *Bowly* should thus have remained in an error himself; and they believe that until he was informed by an intimate friend of legal knowledge, who had occasion to examine the said will, that by the said devise he had an immediate right to the said 5 acres, *Daniel Bowly* did remain in that error; and they are informed and believe, that a considerable time, several years before he instituted said ejectment, *Daniel Bowly* was in actual possession of a house which stood upon the said 5 acres, at the place where the letter T is marked on said plat, and the lands around and adjoining to it; which house, and a part of the said ground, constituting part of the said 5 acres, have been ever since held by *Daniel Bowly*, or those claiming under him, and are yet so held; and they further say, that they are assured and they believe, that the reason why *Daniel Bowly* did not sooner bring his said ejectment, was his desire and hope to have settled the dispute with *Lammot* amicably, and that he a long time before bringing his suit, did inform *Lammot* of his claim, and endeavoured to come to a settlement with him, and that it was not until he lost all hopes of accomplishing that object that he instituted the said ejectment to obtain a legal decision upon his right and title under the said will. That though they do not know or admit that *Daniel Bowly* was in any manner privy to or acquiescing in the said first sale, as far as it interfered with the said rope-walk, or the said devise; yet should that appear to be the case, they feel the most perfect conviction it was owing to and during the time of his ignorance of his right, for nothing can be more improbable or absurd, than

to suppose that he would thus needlessly have consented
or permitted land, to which he thought himself entitled, to
be thus sold for the payment of debts due from *William
Lux* and himself; which *George Lux* was bound to pay;
when the said *George* had such ample means for payment
out of his own property, which was answerable for it; and
that he would so wantonly sacrifice, for so trifling a con-
sideration, property, which from its vicinity to *Baltimore-
town* was certain to become so highly valuable. And from what
was the conduct of *Daniel Bowly* after he became informed
of his right, it may be reasonably inferred what would have
been antecedently his conduct, had he earlier known his
right. But should it appear that *Bowly* has, in any manner,
been consenting, for any reason, to the sale of the small part
of ground, which according to the first sale interferes with
the 5 acres by the location, he has claimed it as located on
said plat, so far that the complainants should be considered
entitled to relief, as to that part; they contend that they in
equity are entitled to be recompensed for it, by being per-
mitted to extend the long square in width so far as to con-
tain 5 acres, clear of that small part; and they say that on
the said plat, the 5 acres claimed by *Daniel Bowly* is in-
cluded in the parallelogram, formed by the lines, begin-
ning at the letter I, running to the figure 19, to the figure
20, to the figure 14, and thence to the beginning; they say,
that of the whole 16¼ acres so conveyed to *Daniel Lam-
mot*, they do not include 2 acres, they believe of the ground
so devised to *Daniel Bowly*, therefore *Daniel Lammot*,
and those claiming under him, hold and enjoy at least 14¼
acres of the land so conveyed to him, the title to which is
not contested, and this has cost him no more that £593
15s. much less they believe, than what it was worth at the
time he purchased it, and is, they believe, at this time in-
dependent of the improvements thereon, worth not less
than $50,000. They admit, that *Daniel Bowly* instituted
an ejectment against *Daniel Lammot*, for the purpose of
recovering so much of the said land devised to him, of
which *Daniel Lammot* had taken possession, which, on the
abolition of general court, was sent to the county court
of *Baltimore* county, to be there tried. That at the said
trial, the judges of the said court were of opinion, that
*Bowly* took nothing by the said devise; that the judges of
the court of appeals having reversed their judgment, the

record was by *procedendo* sent back to said county court, where the said suit is now depending, the said proceedings, a copy of which these respondents exhibit. They admit also, the death of *Daniel Bowly*, and that the said defendants are his heirs and representatives. They also admit, that *Daniel Lammot* is dead, and that the complainants are his heirs and representatives, and have succeeded to his rights. They further say, that most of the transactions concerning which they are called on to answer, took place at a time when some of your respondents were not in the *United States*, and when others of them, from their youth, and other circumstances, could have little or no knowledge of them, but that they have endeavoured to obtain what information they could, and having no reason to doubt its correctness, they thus answer and submit themselves to such decree in the premises as to this honourable court shall seem agreeable to equity and good-conscience. Without that, &c.

There was a general replication to the answer, and by agreement of the parties testimony was taken and returned, and a *pro forma* decree passed, dismissing the bill of complaint. From that decree the complainants appealed to this court.

The cause was argued at the last June term, before BUCHANAN, Ch. J. EARLE, MARTIN, and STEPHEN, J.

*Williams*, *Taney* and *Harper*, for the Appellants, in arguing upon the law in the case, contended, 1. That *Bowly* must be presumed to have known his rights under the will of *William Lux*. That he did know them was partly admitted by the answer, and clearly proved by the evidence; the maxim, therefore, that *ignorantia juris non excusat*, fully applied to this case. They cited *Pockley vs. Pockley*, 1 *Vern.* 36. *Hobbs vs. Norton*, *Eid* 106. 4 *Vin. Ab.* 587, pl. 3. 1 *Fonbl.* 163, *(and note.)* *Doct. & Stud.* 79, 151, 132, 251. *Mildmaye's* case, 1 *Coke*, 177. *Bilbie vs. Lumley*, 2 *East*, 469, *(and notes.)* *Stevens vs. Lynch*, 12 *East*, 38. *Shotwell vs. Murray*, 1 *Johns. Chan. Rep.* 516. *Lyon vs. Richmond*, 2 *Johns. Chan. Rep.* 59. *Williams vs. Hodgson*, in this court, at December term 1809; and *Beck vs. Thompson & Maris*, *Ibid* December 1819, per *Dorsey*, J.

1825.

Lammot
vs
Bowly

2. *Bowly* being cognizant of the facts, and bound to know the law, he is in the predicament of one who stands by and sees his property sold by another, without objecting or notifying the purchaser of his title. He is presumed to have acquiesced, and is clearly estopped from impeaching the sale. They cited *Sugd. L. V.* 522, (472.) *Hobs vs. Norton*, 2 *Chan. Ca.* 128. *Hanning vs. Ferrers*, 1 *Eq. Ca. Abr.* 356, pl. 10. *Mocatta vs. Murgatroyd*, 1 *P. Wms.* 393. *Pow. on Mort.* 463, 464. *Rob. on Frauds*, 130. *Niven vs. Belknap*, 2 *Johns. Rep.* 589; and *Taylor vs. Cole*, 4 *Munf.* 351.

3. *Lammot*, purchasing from *Russell* through *Gough*, is only presumed to look to the conveyance from *George Lux* to *Russell*; and the recording of *William Lux's* will was not constructive notice of its contents to *Lammot*, and is no evidence of actual notice. They cited *Morecock vs. Dickens, Ambl.* 678. *Bedford & Backhouse vs. Baccus*, 2 *Eq. Ca. Abr.* 615, pl. 12. *Cator vs. Cooley*, 1 *Cox's Rep.* 182. *Pow. on Mort.* 634. *Williams vs. Sorrell*, 4 *Ves.* 389. *Pentland vs. Stokes*, 2 *Ball & Beatty*, 75; *Bushell vs. Bushell*, 1 *Sch. & Lef.* 90. *Latouche vs. Dunsany, Ibid* 157. *Underwood vs. Courtown*, 2 *Sch. & Lef.* 64. *Holliday vs. Aiken*, per Chan. *Kilty* in 1808; and *Sugd. L. V.* 531, (new ed.)

4. But supposing *Bowly* and *Lammot* to be equally acquainted with the contents of *William Lux's* will—*Lammot* is a *bona fide* purchaser for a valuable consideration, without notice, and *Bowly* claims under a *voluntary conveyance*, as devisee. Courts of equity have, and justly, a strong leaning and predilection for such purchasers over volunteers. They cited 1 *Fonbl.* 168. *Sugd. L. V.* 522, 547, 557, (new ed.) *Malden vs. Menill*, 2 *Atk.* 8. *Warwick vs. Warwick*, 3 *Atk.* 293. 1 *Eq. Ca. Abr.* 333, 384. 2 *Eq. Ca. Abr.* 79, pl. 1. 1 *Ball & Beatty*, 271. *Jerrard vs. Saunders*, 2 *Ves. jr.* 454; and *Bovey vs. Smith*, 1 *Vern.* 144.

5. The facts and principles of law, applicable to this case, place *Bowly* in the condition and character of an actual *vendor* of this property—inasmuch as the purchase money was applied, with his knowledge and consent, to the discharge of a debt, for which he was bound as *principal* debtor. They cited *Sugd. L. V* 443, 523, 534, (new ed.) *Jennings vs. Moore*, 2 *Vern.* 609; and *Niven vs. Balknap*, 2 *Johns. Rep.* 589.

1825.

Lammot
vs.
Bowly

C. *Bowly*, by his conduct after he became trustee of *George Lux*, confirmed the acts of *Russell*, and made them his own. He ratified every thing which *Russell* had done in this transaction, after knowing the facts. It was his duty to know what his predecessor had done, and when it was not too late, to have corrected his mistakes—to have taken back his property, and restored the purchase money, either to *Gough*, or to *Lammot*. It is now too late to disavow *Russell's* acts. They cited *Bovey vs. Smith*, 1 *Vern.* 146, (*arguendo.*) *Murray vs. Palmer*, 2 *Sch. & Lef.* 486. *Mocatta vs. Murgatroyd*, 1 *P. Wms.* 394. *Newl. on Cont.* 499; and *Frost vs. Beekman*, 1 *Johns. Chan. Rep.* 296, 297.

7. Even if *Bowly* is not to be regarded in the light, either of a vendor, or of a trustee, under the circumstances of this case, his conduct is clearly fraudulent towards *Lammot*; and he is seeking to benefit himself by his own fraud. 1st. He stands by and sees his property sold by another, and permits himself, and indeed claims to be benefitted by seeing the purchase money applied to his credit for his own debt. 2d. Even if it was not his debt, but *Lux's*, he acted fraudulently in permitting *Lammot* to pay *Lux's* debts without consideration, and thereby increasing the means of an estate on which he was a large creditor, which if the estate was *insolvent*, was a direct benefit to *Bowly*. 3d. If the estate of *Lux* was *solvent*, then he acted fraudulently towards *Lammot* in not indemnifying *Lammot*, after he had possession of all *Lux's* estate in 1796; knowing, as he did, that the former had assumed, without consideration, the payment, or rather had paid £503 13s. of *Lux's* debts; and which estate he then represented as trustee. And these circumstances are, in their *fraudulent* character, immensely enhanced, by being connected with the fact, that the land, for which this money was paid by *Lammot*, is claimed by the witness, who is the participator if not the principal in this fraud.

*R. Johnson*, and *Wirt*, (Attorney General of *U. S.*) contended, that where both parties were equally under a mistake as to the rights of either, the party having the legal title is to be preferred.

1. *Bowly* had no notice at least of the sale of the two acres.

2. If there was fraud it should have been taken advantage of in the trial at law.

3. If there was notice and no fraud, yet *Bowly* had no notice of his rights, and his acquiescence will not prejudice him.

4. Both parties present themselves equally entitled to equity; and

5. The parties were equally bound to take notice of *Bowly's* title, the will being on record.

On the *second point*, they cited *Le Guen vs. Gouverneur*, 1 Johns. Cas. 436. *Bright vs. Eynon*, 1 Burr. 390. *Boring's Lessee vs. Singery*, 4 Harr. & M·Hen. 404. *Attorney General vs. Singery* in this court, (June 1809.) *Boring's Lessee vs. Lemmon*, 5 Harr. & Johns. 223. 9 Poth. 385 to 391. *Moses vs. Macferlan*, 2 Burr. 1005. *Farmer vs. Arundel*, 2 W. Blk. Rep. 824.

On the *third point*—1 Ruth. Inst. B. 1, ch. 8, 126. 1 Pow. on Cont. 133, 134. *Welford vs. Beasly*, 1 Ves. 6. Newl. on Cont. 432, 433. 1 Fonbl. 45, 46, 161, (note m.) 2 Poth. 412, 413, 414, 417, 373, 329, 385 to 391, 408, 409. *Ancher vs. The Governor and Company of the Bank of England*, 2 Doug. 638. *Bize vs. Dickason*, 1 T. R. 285. *Farmer vs. Arundel*, 2 W. Blk. Rep. 824. *Williams vs. Bartholomew*, 1 Bos. & Pull. 326. 4 Blk. Com. 26. *Lansdowne vs Lansdowne*, Mosely's Rep. 364. 2 Pow. on Cont. 195. *Sugd. L. V.* 166. *Bingham vs. Bingham*, 1 Ves. 126, 127. *Simpson vs. Vaughan*, 2 Atk. 33. *Turner vs. Turner*, 2 Chan. Rep. 81. *Pusey vs. Disbouverie*, 3 P. Wms. 316, 320. *Cole vs. Gibson*, Ibid 290. *Broderick vs. Broderick*, 1 P. Wms. 299. *Chesterfield vs. Janssen*, 1 Atk. 301, 354. *East India Company vs. Vincent*, 2 Atk. 83. *Evans vs. Llewellen*, 1 Cox's Rep. 333. *Dyer vs. Dyer*, 2 Chan. Ca. 108. *Cholmondley vs. Clinton*, 2 Meriv 171. *Hunt vs. Rousmanier*, 8 Wheat. 174. *Levy vs. The Bank of the U. S.* 1. Binney, 37. *Sugd. L. V.* 522, 557, (new ed.) *Malden vs. Menil*, 2 Atk. 8; and *Pearson vs. Morgan*, 2 Bro. Chan. Ca. 388.

On the *fifth point*—*Morecock vs. Dickens*, Ambl. 678. *Sexton vs. Wheaton*, 8 Wheat. 229. *Cholmondley vs. Clinton*, 2 Meriv. 171. *Sugd. L. V.* 508. *Frost vs. Beekman*, 1 Johns. Chan. Rep. 298, 299; and *Parkist vs. Alexander*, Ibid 398.

*Cur. adv. vult.*

Stephen, J. at this term, delivered the opinion of the court. On the 5th of May, in the year 1773, *William Lux* of *Baltimore* county, made and executed, in due form of law, his last will and testament, which contains the following clause: "I give and bequeath to my dear wife, *Agnes Lux*, for and during her natural life, my tract of land and plantation called *Chatsworth*, with the dwelling-house, and all the buildings and improvements thereon, (save and except the rope-walk.") "I give and bequeath to my dear son *George Lux*, his heirs and assigns, my tract of land called *Chatsworth*, lying and being in *Baltimore* county, containing nine hundred and fifty acres; but in case my said son should die before he attains of legal age, and without issue, then I leave and bequeath the said tract of land, called *Chatsworth*, to my dear wife *Agnes Lux*, or her assigns, to be at her own will and disposal, as it originally was, (save and except five acres, to be laid of in a long square, on the south two degrees west one hundred and thirty-one perches line, being the fifth line from the beginning, and that said five acres, together with the ropewalk and all the buildings and improvements thereon, I give and bequeath to my dear nephew and partner, *Daniel Bowly*, his heirs and assigns." *George Lux*, on the 17th day of April, in the year 1787, by deed, reciting that whereas he was indebted to several persons in large sums of money, which he was desirous to discharge, and for other purposes therein specified, conveyed, among other property, all that part of a tract of land called and known by the name of *Chatsworth*, which had not theretofore been granted and conveyed, to *William Russell*, and his heirs, in trust, to sell and dispose of the same, and with the proceeds of sale to pay and extinguish the debts due by him, the said *George*, and the residue thereof, if any there should be, to appropriate in the manner by the said deed directed. On the 20th day of July, in the year 1787, *William Russell*, in virtue of the trust with which he was invested by the deed above mentioned, sold to *Daniel Lammot* fourteen acres and one quarter of an acre of land, in fee simple, being part of the said tract of land called *Chatsworth*. And on the second day of April, in the year 1789, the said *William Russell* sold to the said *Lammot* two acres more of said land, in fee, making in the whole sixteen acres and one quarter of an acre, for the consideration of five hundred and ninety-three pounds fifteen shillings current mo-

ney. *William Lux* and *Daniel Bowly*, being indebted to a certain *Harry Dorsey Gough* in the sum of five hundred pounds, by bond bearing date the eleventh day of August, in the year 1768, it was agreed between the said *Russell*, *Lammot* and *Gough*, that *Gough* would credit the bond of *Lux* and *Bowly* with the amount of the purchase money, and that the land, so as aforesaid sold, should be conveyed to *Gough*, to make the same responsible to him for the credit so given.    In pursuance of said agreement, *William Russell*, on the 27th day of April in the year 1789, conveyed the said sixteen and a quarter acres to *Gough*, in order to make the same responsible to him for the credit so given.    On the 9th day of May, in the year 1801, *Gough* conveyed to *Lammot* the said sixteen and a quarter acres of land, for the consideration therein specified.    It appears, from the proof in the cause, that *Bowly* had perfect knowledge of the sale of the fourteen and a quarter acres of land, and of the location thereof, and there is reason to believe, from the testimony, that he also knew of the second sale of the two acres.    It further appears from the evidence, that on the days when the said sales were respectively made, the bond of *Daniel Bowly* and *George Lux* was credited with the amount of the pur_chase money, stipulated to be paid for the sixteen and a quarter acres of land sold as aforesaid; the bond of *William Lux* and *Daniel Bowly* having been substituted, after the death of *William Lux*, by the bond of *Daniel Bowly* and *George Lux*.    In what character *Bowly* stood bound in the original bond, whether as principal or surety, no where expressly appears from the proof; though it is strongly to be inferred, from the circumstances in the case, that they were both bound as principals, as if they were not, it is not to be believed that *Lux* would have assumed upon himself a liability to pay the debt after the death of his father.    The said *William Russell*, by deed bearing date the 7th day of May 1796, relinquished his trust to *Daniel Bowly*, who on the 6th of June 1799, substituted the bond of *Bowly* and *Lux*, by his own obligation to *Gough*, for £1000, which it is presumed he was induced to do, as he had succeeded to the trust originally vested in *Russell*, and had thereby obtained possession of *George Lux's* property, which he was authorized to apply to the payment of his part of said debt.    Although the bond of *Bowly* and *Lux*

was credited by *Gough* with the amount of the said sales of 16½ acres of land, sold by *Russell* to *Lammot*, it does not appear that *Bowly* derived any benefit or advantage by such credit, because it amounted to very little more than *Lux's* one half of the debt, supposing them to be equally bound, (which, from the facts and circumstances in the case it is presumed they were;) and because it further appears, that the bond from *Bowly* to *Gough*, which was substituted for the bond of *Bowly* and *Lux*, was satisfied and paid with *Bowly's* own funds; and because it further appears from the testimony in the cause, that *William Lux*, at the time of his death, was considerably indebted to *Bowly*, for the payment of which debt, the property of *William Lux* was more than sufficient. It appears from the testimony of the late Judge *Ridgely*, who was the intimate friend and legal adviser of *Bowly*, that although *Bowly* was well acquainted with the devise to him in the will of *William Lux*, yet he never believed that he became entitled to the land thereby devised, till the death of *George Lux* without issue; and that after the death of *George Lux's* son, and he thinks also after the death of his wife, he was consulted by *Bowly* on the legal effect and operation of certain clauses in *William Lux's* will, and particularly with regard to the rope-walk which was erected upon the five acres of land devised to *Bowly* by the will of *William Lux*; and that the opinion which he gave to *Bowly* was, that he became entitled to the rope-walk, and the land appertaining to that establishment, under said will, independent of the contingency of *George Lux's* death without issue. Some time after *Bowly* had obtained this opinion, he instituted an action of ejectment in the late general court, for so much of the five acres as *Lammot* purchased; on the abolition of which court, the cause was sent to *Baltimore* county court, to be there tried; the judges of that court were of opinion that *Bowly* took nothing by the devise, from whose judgment there was an appeal to this court, and at June term 1810, the judgment of the county court was reversed, and the case remitted to said county court, with a *procedendo*, where the suit is now pending. The complainants, who are the representatives of *Lammot*, filed a bill on the equity side of *Baltimore* county court, to obtain an *injunction* to stay proceedings at law, and to have a conveyance of all the right and title of *Bowly's* re-

1825.

Lammot
vs
Bowly

presentatives, to the purchases made by *Lammot* in his life-time, executed to them. The county court, with the consent of the parties, decreed *pro forma* a dismissal of the complainant's bill, with costs to the defendants; from which decree the defendants have appealed to this court. The question now to be decided is, whether or not they have shown sufficient grounds of equity to entitle them to the relief, which they come here to obtain? And whether they are so entitled, depends upon the agency which *Bowly* had in the purchases made by their deceased ancestor; and the knowledge he had of his rights at the time they were made. The principle involved in the decision of this question is an important one, as well on account of its immediate bearing upon this case, as of the influence and operation it may hereafter have in deciding questions of title which may arise under similar circumstances. The question presented for the decision of this court is simply this, whether a man, having a legal title to a parcel of land, but who is ignorant of his right, forfeits his title to that land, by concealing his right, when he knows that another is about to purchase it from a third person? And this question is to be decided upon the principles of equity and conscience, which can never inflict a punishment upon innocence, or decree a forfeiture, when there has been no fault. On the contrary, it is at all times the anxious wish of a court of chancery to relieve against forfeitures and penalties, where the principles of justice and equity do not forbid it. Has then the conduct of *Daniel Bowly* been such as to merit the infliction of punishment at the hands of this court? Because a punishment it is termed by the authorities which treat upon the subject, and they speak of the forfeiture as a punishment inflicted by reason of the guilt of the party in not disclosing his right. It would, at the first blush, seem quite sufficient to ask, how can a man disclose a title of which he has no knowledge? To the common sense of the world this would seem to be an impossibility, and the law, which is a system of written reason, never enforces a vain or impossible thing. It is proved by all the witnesses who speak upon the subject, that they never heard of *Bowly's* claiming any title to the property in question, until long after the purchases were made by *Lammot*, and all of them were his neighbours, and some of them his most intimate friends. Nor is it a matter of surprise that *Bowly* was unacquainted with

1825.

Lannuet
vs
Bovly

the operation of law upon that clause of *William Lux's* will, under which his representatives now claim title to the property in controversy, since it appears that the judicial tribunals of the state entertained different opinions upon the true construction of it, aided as they were by all the lights of science in their exposition of it. It may then be safely assumed to have been at least a doubtful question, and one upon which it is not unreasonable to say, that *Bowly* might have been in the dark. If then he was ignorant of his title, what says the law upon the subject? In 1 *Powell on Contracts*, 131, 132, 133, after stating that there might be either an express or tacit assent to a contract or agreement, he says, "a tacit assent may arise in several ways—It may be inferred from inaction, or forbearance of acting. Thus a man, by his silence, in case he be present, and acquainted with what is doing, is supposed to give his assent to what is then done; unless it appears that he was awed into silence, or any way hindered from speaking." "And in such cases, assent is presumed even against an infant; for it is meant as a punishment for his concealing his right, by which an innocent person is drawn in to advance his money." If then a tacit assent is imputed to infants, who are peculiarly the objects of a court of chancery's care and protection, it can only be upon the ground of knowing their rights, and a culpable and fraudulent concealment of such knowledge. The same author says, in page 134, "in order to warrant us in concluding from a man's silence, that he has relinquished his right, two things are necessary— The first is, that he should know that what belongs to him is conveying to another; for when one forbears to act through mere ignorance, it can have no effect"—and "secondly, that he should be voluntarily silent, though he has full liberty to speak." So in 1 *Fonblanque*, 161—The author says, "there is also an implied as well as an express assent; as where a man, who has a title and knows of it, stands by, and either encourages, or does not forbid the purchase, he shall be bound, and all claiming under him, by it. Neither shall infancy or coverture be any excuse in such case. And this seems a just punishment for his concealing his right, by which an innocent man is drawn in to lay out his money." It is then upon the principle, that the party committed a fraud by concealing his right, that he becomes bound, and all claiming under him. In *Niven vs.*

*Belknap*, 2 *Johnson's Rep.* 589, the same principle is recog-
nized by *Thompson*, Justice, that where a man has a title,
and knows of it, and either encourages, or does not forbid
the purchase, he, and all claiming under him, shall be bound
by such purchase; and in support of his opinion he refers to 1.
*Fonblanque*, 161. In *Levy vs. The Bank of the United*
*States*, 1 *Binney's Rep.* 27, the case was this; a forged check
was credited as cash in the holder's bank book, and he being
afterwards informed that the check had been forged, under
a mistake of his legal rights, agreed that if the check was
a forgery, he would not take advantage of the deposit.
*Shippen*, chief justice, decided, that the party was not
bound by his agreement, it being made under a mistake of
his right. In this case the chief-justice says, "the case of
*Penn* and Lord *Baltimore* is decisive to this point. I was
present at the agreement half a century ago, and heard
Lord *Hardwicke* say, though it is not mentioned in the
printed report, that if Lord *Baltimore* made the agree-
ment in question, under a mistake of his right to another
degree of latitude, he ought to be relieved, but that he was
not mistaken." In *Green vs Price*, 1 *Munford*, 458, Judge
*Tucker* lays down the law to be, that if a man has an
equitable title to lands, and knows of it, and either en-
courages, or does not forbid the purchase, he, and all
claiming under him, shall be bound, by it; and in support
of his opinion he refers to 1 *Fonblanque*, B. 1 *ch.* 3, *s.* 4.
Thus it appears, that some of the most enlightened and
eminent judges of our country, have given their sanction
to the doctrine, that a party is not bound by his silence,
unless he has a knowledge of his right, and fraudulently
conceals it where he ought to speak. In *Bize vs Dickason*,
1 *T. R.* 285, Lord *Mansfield*, in delivering the opinion of
the court, is reported to have said, "the rule had always
been, that if a man has actually paid, what the law would
not have compelled him to pay, but what in equity and
conscience he ought, he cannot recover it back again in an
action for money had and received. But where money
is paid under a mistake, which there was no ground to
claim in conscience, the party may recover it back again
by this kind of action." *Evans*, in his essays, treating upon
mistakes of law, lays down the law to be, that where no
natural obligation intervenes, even what is paid under a
mistake in law, may be recovered back; and he refers, in

1825.

Lammot
vs
Bowly

support of his opinion, to certain decisions of Lord *Kenyon* and Lord *Mansfield*, to the same effect, and observes, that he conceives it may now be positively stated, that this opinion is adopted in the *English* law. In *Evans vs. Llewellyn*, 2 *Brown's Chancery Cases*, 150, it is decided, that a conveyance obtained from persons uninformed of their rights, should be set aside, though there was no actual fraud or imposition. In *Hunt vs. Rousmanier*, 8 *Wheat.* 214, the chief justice, in speaking of the case of *Lansdowne vs. Lansdowne*, says, if it be law, it has no inconsiderable bearing on this cause. There are certainly strong objections to this decision in other respects; but as a case in which relief has been granted, or a mistake in law, it cannot be entirely disregarded. He then goes on to say—"Although we do not find the naked principle that relief, may be granted on account of ignorance of law, asserted in the books, we find no case, in which it has been decided, that a plain and acknowledged mistake in law, is beyond the reach of equity." We have here, then, the high authority of this most distinguished man, and eminent judge, that a party acting under a clear and unequivocal mistake of his legal rights, is entitled to relief in a court of equitable jurisdiction; and that the doctrine of a court of chancery is not, as has been contended, that equity will not administer relief upon that ground, upon the principle that every man is bound to know the law. It is not intended to say, that the plea of *ignorantia juris* would in all instances be available in civil cases, (in criminal it never can be,) because some legal propositions are so plain and familiar, even to ordinary minds, that it would be doing violence to probability to impute ignorance in such cases; but it is only meant to say, that where the legal principle is confessedly doubtful, and one about which ignorance may well be supposed to exist, a person acting under a misapprehension of the law in such a case, shall not forfeit any of his legal rights, by reason of such mistake. So *Newland*, in his treatise on contracts, says, that mistake or misapprehension of the law, is a ground of relief in equity; as if a man purchases his own estate, and pays for it, the court will order the purchase money to be refunded, on the ground that there was a plain mistake. It appears then, from what has been observed in the foregoing opinion, that some of the most enlightened

and celebrated men, whose characters are recorded in judicial history, have given the sanction of their illustrious names to the doctrine, that no man, acting under a plain and acknowledged mistake of his legal rights, shall forfeit those rights, in consequence of such misapprehension. The authorities in support of this principle, might be multiplied to an almost indefinite extent, but it is deemed unnecessary further to enlarge upon the subject. It is the opinion of this court, that the decree of the court below be affirmed, with costs to the appellees. DECREE AFFIRMED.